**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Board of Regents, | No. CV-24-03519-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Team ASU LLC, | |
| Defendant. | |

Pending before the Court is Plaintiff's motion for default judgment. (Doc. 17.) For the reasons that follow, the motion is denied without prejudice.

## BACKGROUND

Arizona Board of Regents ("Plaintiff"), for and on behalf of Arizona State University, brings this action against Team ASU, LLC ("Defendant"), a Florida limited liability company, "seeking injunctive relief, damages, treble damages and/or profits, pre-judgment interest, attorneys' fees and costs under the Lanham Act based on Defendant's encroachment and infringement of [Plaintiff's] ASU trademark in connection with the unauthorized use of the ASU mark on athletic fitness equipment, sports training equipment, and other merchandise, and rendering of services to consumers and athletes under the ASU mark, even though such goods and services were not authorized or sponsored by Arizona State University." (Doc. 1 at 1 & ¶¶ 1, 5-6.)

Specifically, Plaintiff owns several trademarks of "an illustration drawing" that includes the letters "ASU" incorporating an image of a "sun, rising or setting (partially

obstructed)," including one with the U.S. Registration Number 2147709, pertaining to "backboards for basketball, baseballs, basketballs, board games, dolls, golf ball markers, golf balls, rubber action balls, sports balls, stuffed toy animals, tennis balls." (Doc. 1 ¶ 8; Doc. 1-1 at 3.)  This trademark (hereinafter, the '709 mark) looks like this:

**ASU**

Plaintiff also owns another trademark—this one for providing a fitness center, care, and wellness programs at an assisted living and independent living facility—that has the same illustration but with colors, maroon and gold, claimed as a feature of the mark, with the letters in maroon and the sun in gold.  (Doc. 1 ¶ 8; Doc. 1-1 at 16.)  Plaintiff also owns several trademarks consisting of just the letters "ASU," consisting of "standard characters without claim to any particular font style, size, or color."  (Doc. 1 ¶ 8; Doc. 1-1 at 32, 40, 48. 54.)  Those trademarks are valid with respect to four categories of goods and services: (1) certain clothing items, including t-shirts and shorts; (2) sponsoring certain "educational and entertainment services," including "athletic events"; (3) certain food and drink containers; and (4) hotel, restaurant, and other services.  (Doc. 1 ¶ 8.)

On June 3, 2021, Defendant applied to the United States Patent and Trademark Office ("USPTO") for a trademark for the mark "ASU TRAINER in stylized form and design for 'Exercise equipment in the nature of exercise bands, battle ropes, ab rollers, jump ropes; Jump ropes incorporating digital counters; Physical fitness equipment, namely, exercise bands, battle ropes, ab rollers, jump ropes.'"  (Doc. 1 ¶ 28; Doc. 1-1 at 72-73.) This application bore the serial number 90751418 and is designated as the '418 Application.  (Doc. 1 ¶ 28.)  The '418 mark looks like this:



(Doc. 18-1 at 4.)

On February 28, 2022, the USPTO issued a nonfinal office action refusing to register the mark "because of a likelihood of confusion with the mark(s) in U.S. Registration No(s). 2147709" and permitting a response to the refusal, with various requirements, including "an amended description of the mark because the current one is incomplete and does not describe all the significant aspects of the mark." (Doc. 1 ¶ 29; Doc. 1-1 at 72-76.)  The USPTO suggested the following description: "The mark consists of the stylized 'ASU TRAINER' wording next to the stylized design of two triangles next to each other, with one triangle being upside down, and both triangles created by smaller triangles and quadrilaterals." (Doc. 1-1 at 76.)  The USPTO also required the addition of a disclaimer: "No claim is made to the exclusive right to use 'TRAINER' apart from the mark as shown." (*Id.* at 76-77.)  Finally, the USPTO required that a generic term be substituted for the trademarked term "ab rollers." (*Id.* at 77.)

On March 23, 2022, Defendant responded to the USPTO office action but was unable to convince the examiner to withdraw the refusal of the mark. (Doc. 1 ¶ 31.)  As a result, a final office action issued on April 12, 2022, again refusing to register '418 mark. (*Id.*)  Defendant did not respond, and the '418 Application "was abandoned on October 13, 2022." (*Id.* ¶ 32.)

On January 10, 2024, Defendant filed an application with the serial number 98350490 for a mark "consist[ing] of the wording ASUTRAINER in stylized font to the right of the stylized design of two triangles next to each other, with one triangle being upside down, and both triangles created by smaller triangles and quadrilaterals," with color "not claimed as a feature of the mark," for "Exercise equipment in the nature of exercise bands, battle ropes, ab wheel rollers, jump ropes; Jump ropes incorporating digital counters; Physical fitness equipment, namely, exercise bands, battle ropes, ab wheel rollers, jump ropes" ("the '490 mark"). (Doc. 1 ¶ 33; '490 Application).[1]  The '490 mark looks like this:

---

[1]     Plaintiff attached some, but not all, of the relevant documents from the USPTO to the complaint.  All of the documents are publicly available on the USPTO website and are incorporated by reference into the complaint.

(Doc. 18-7 at 2.)

On August 12, 2024, the USPTO issued a nonfinal office action refusing to register the mark, again due to a likelihood of confusion with the '709 mark.  (Doc. 1 ¶ 34.)

On December 11, 2024, the USPTO issued a notice of abandonment, indicating that Defendant had not responded to the nonfinal office action by the deadline.  (Doc. 18-7 at 3.)

On December 12, 2024, Plaintiff filed the complaint.  (Doc. 1.)  The complaint alleges as follows.  Plaintiff owns the only federally registered mark containing the letters "ASU" in class 28, covering sports equipment.  (Doc. 1 ¶ 9.)  Plaintiff also owns various federally registered marks containing the letters ASU that pertain to other classes of goods and services that are at least indirectly related to sports and fitness, such as class 18 (which includes "all purpose athletic bags"), class 41 (which includes "providing fitness facilities" and "sponsoring athletic events"), and class 25 (which includes t-shirts and shorts).  (*Id.* ¶ 8.)  Meanwhile, Defendant "offers for sale and sells fitness and athletic equipment and other merchandise through their website at www.asutrainer.com," which is "available nationally, including in Arizona," and the items advertised and sold via this website "bear[] the ASU mark[s]."  (*Id.* ¶¶ 24-25.)[2]  The denial of Defendant's '418 application put

[2] The complaint identifies various marks owned by Plaintiff but repeatedly refers to "the ASU mark," a singular term that is undefined, or rather, defined in an entirely circular manner: "This is an action by Arizona State University against Defendant seeking injunctive relief, damages, treble damages and/or profits, pre-judgment interest, attorneys' fees and costs under the Lanham Act based on Defendant's encroachment and infringement of its ASU trademark in connection with the unauthorized use of the ASU mark on athletic fitness equipment, sports training equipment, and other merchandise, and rendering of services to consumers and athletes under the ASU mark, even though such goods and services were not authorized or sponsored by Arizona State University, the owner of the ASU mark ('ASU Mark')."  (Doc. 1 ¶ 1.)  Because the complaint fails to clarify which of the various marks owned by Plaintiff fall within the term "the ASU Mark," the Court construes that term as referring to all of the marks referenced in the complaint, despite the singular construction of the term (*i.e.*, "the ASU Mark," not "the ASU Marks").  Each mark, of course, remains distinct.  Lumping them together and using a singular designation

- 4 -

Defendant on notice "that its use of ASU in connection with its goods and services was likely to cause confusion" with the ASU marks. (*Id.* ¶ 37.) Defendant's inclusion of the letters "ASU" in its trade name, Team ASU, LLC, and in its domain name, asutrainer.com, was additional "deliberate infringement." (*Id.* ¶ 38.) Defendant's conduct was "deliberately calculated to confuse and deceive the public" and "tends to and does create the erroneous impression that Defendant's products and services emanate or originate from Arizona State University, and/or that said products and services are authorized, sponsored, or approved by Arizona State University, even though they are not." (*Id.* ¶¶ 40-41.) This "causes irreparable harm to Arizona State University" and to the ASU marks and allows Defendant to benefit from "the outstanding reputation" of the ASU marks and "the significant advertising and promotion of goods and services by Arizona State University in connection with" the ASU marks. (*Id.* ¶¶ 42-43.) The complaint asserts three claims: (1) trademark infringement in violation of 15 U.S.C. § 1114; (2) false designation of origin, false descriptions and representations, and unfair competition in violation of 15 U.S.C. § 1125(a); and (3) unfair competition and trademark infringement under Arizona common law. The complaint seeks a permanent injunction ordering that Defendant be enjoined from using the letters "ASU" in any way, anywhere, that Defendant destroy everything it owns bearing those letters, and that Defendant forfeit its domain name to Plaintiff. (Doc. 1 at 16-18.) The complaint also seeks treble damages, punitive damages, costs, fees, and interest. (*Id.* at 17-18.)

On March 31, 2025, after some service-related complications (Docs. 8-11), Plaintiff served Defendant. (Doc. 14.)

On April 24, 2025, Plaintiff applied for entry of default against Defendant (Doc. 15), and on April 25, 2025, the Clerk entered the default (Doc. 16).

---

cannot transform the various marks into one unified mark or blur the distinctions between the marks. *See, e.g., Penn Eng'g & Mfg. Corp. v. Dongguan Zhengmao Precision Hardware Factory*, 2021 WL 5176471, *4 (D. Nev. 2021) ("[T]he Motion for Default Judgment appears to group the original PEM Mark with the 'PEM Family of Marks' and refers to them all collectively (and confusingly) as 'the PEM Marks.'"); *Tecumseh Poultry LLC v. Perdue Holdings, Inc.*, 2012 WL 3018255, *5 (D. Neb. 2012) (noting "clarification is in order" because the plaintiff referred to various marks "collectively").

On July 11, 2025, Plaintiff filed the pending motion for default judgment (Doc. 17) and declaration in support thereof (Doc. 18).

## DISCUSSION

The "decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). Although the Court should consider and weigh relevant factors as part of the decision-making process, it "is not required to make detailed findings of fact." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002).

The "starting point is the general rule that default judgments are ordinarily disfavored." *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 616 (9th Cir. 2016). The following factors may be considered when deciding whether default judgment is appropriate under Rule 55(b): (1) the possibility of prejudice to the plaintiff, (2) the merits of the claims, (3) the sufficiency of the complaint, (4) the amount of money at stake, (5) the possibility of factual disputes, (6) whether the default was due to excusable neglect, and (7) the policy favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). "The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977). With that said, "a defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law," and "allegations that parrot the language" of a statute "are not well-pleaded facts" but rather are "legal conclusions" that are not admitted through default. *DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007). "[N]ecessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992). "[A]ny doubts as to the propriety of a default are usually resolved against the party seeking a default judgment." *Pearson v. Nationstar Mortg., LLC*, 2016 WL 5496268, *3 (C.D. Cal. 2016).

…

…

I.    The Third *Eitel* Factor—Sufficiency Of The Complaint

The second and third *Eitel* factors—the merits of the claim and the sufficiency of the complaint—"are often analyzed together." *Vietnam Reform Party v. Viet Tan-Vietnam Reform Party*, 416 F. Supp. 3d 948, 962 (N.D. Cal. 2019). Nevertheless, there is no requirement to combine the two inquiries and, as explained below, the Court finds it useful to separately address them here. Accordingly, the analysis in this section of the order focuses on the sufficiency of the complaint, while the analysis in the next section focuses on the merits.

Plaintiff seeks default judgment on all three of its claims. (Doc. 17 at 10.) Count One, for trademark infringement under 15 U.S.C. § 1114, "requires only two elements: (1) ownership of a trademark, and (2) that the plaintiff show a likelihood of confusion." *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072 (9th Cir. 2014). Count Two, for false designation of origin under 15 U.S.C. § 1125(a), also requires a likelihood of confusion. *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 n.6 (9th Cir. 1999). And the state-law claim in Count Three, like Counts One and Two, turns on "whether the public is likely to be deceived." *Boice v. Stevenson*, 187 P.2d 648, 653 (Ariz. 1947).[3] *Cf. Int'l Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912, 916 (9th Cir. 1980) ("[F]ederal and state laws regarding trademarks and related claims of unfair competition are substantially congruent. Therefore the choice of federal or state law frequently has no impact on the outcome, leading courts to avoid the issue. This does not, however, alter the fact that there are distinct federal and state rights.") (citations omitted); *Angel's Gate Inc. v. All-Star Grand Canyon Tours Inc.*, 2013 WL 12114580, *2 (D. Ariz. 2013) ("Because Arizona's trademark infringement statute mirrors the Lanham Act, cases interpreting the Lanham Act guide the interpretation of A.R.S. § 44-1451.") (cleaned up).

---

[3]    "The common law doctrine of unfair competition . . . encompasses several tort theories, such as trademark infringement, false advertising, 'palming off,' and misappropriation." *Fairway Constructors, Inc. v. Ahern*, 970 P.2d 954, 956 (Ariz. Ct. App. 1998). Here, the complaint does not differentiate between the theories or allege any facts to indicate on what basis the Arizona common law doctrine of unfair competition is invoked, but at any rate, all of the theories require a likelihood of confusion.

"The limited purpose of trademark protections set forth in [the Lanham Act] is to avoid confusion in the marketplace by allowing a trademark owner to prevent others from duping consumers into buying a product they mistakenly believe is sponsored by the trademark owner." *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 806 (9th Cir. 2003) (cleaned up). "The 'likelihood of confusion' inquiry generally considers whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing one of the marks or names at issue in the case. To succeed, a plaintiff must show more than simply a possibility of such confusion." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012) (citations omitted).

> When the goods produced by the alleged infringer compete for sales with those of the trademark owner, infringement usually will be found if the marks are sufficiently similar that confusion can be expected. When the goods are related, but not competitive, several other factors are added to the calculus. If the goods are totally unrelated, there can be no infringement because confusion is unlikely.

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979) (cleaned up).

Here, the goods produced by Defendant are strength training equipment, predominantly ropes and bands for use in physical fitness training. (Doc. 1 ¶ 23; Doc. 1-1 at 58-69; Doc. 18-5 at 2-14.) Plaintiff does not specifically allege that it produces ropes, bands, or any other form of strength training equipment. Instead, Plaintiff alleges that it "provides various athletic facilities and regularly sponsors athletic events," "rents different kinds of sports and fitness equipment," and "sells athletic equipment, clothing, sport caps and shoes." (Doc. 1 ¶¶ 10-12.) The complaint vaguely alleges that Plaintiff performs these activities "under its ASU Mark" (*id.*), although the complaint does not specify which if any of the items being sold or rented bear the '709 mark or another one of the marks described in paragraph 8.

Although the complaint alleges that Arizona State University "rents different kinds of sports and fitness equipment" and "sells athletic equipment" (Doc. 1 ¶¶ 11-12), "fitness" and "athletic" equipment are broad categories, and the allegations do not establish what kind of fitness and athletic equipment Plaintiff rents and sells. Thus, the allegations do not

establish that the parties' goods are competitive. *Sleekcraft*, 599 F.2d at 348 (boat lines not competitive where "[b]oth lines are comprised of sporty, fiberglass boats often used for water skiing" and "the sizes of the boats are similar as are the prices" but the boats "appeal to separate sub-markets" because "Slickcraft boats are for general family recreation, and Sleekcraft boats are for persons who want high speed recreation"). Indeed, the default judgment motion appears to concede that the goods are not competitive, focusing instead on the standard for related goods. (Doc. 17 at 11-12.)

Where goods are not competitive, courts in the Ninth Circuit often turn to the eight "likelihood of confusion" factors, commonly known as the *Sleekcraft* factors, which are "pliant, illustrative rather than exhaustive, and best understood as simply providing helpful guideposts." *Rearden*, 683 F.3d at 1209-10 (cleaned up). *See also Sleekcraft*, 599 F.2d at 348 ("[D]espite the potential market overlap, the two lines are not competitive. Accordingly, we must consider all the relevant circumstances in assessing the likelihood of confusion."). The "eight factors are: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines." *Rearden*, 683 F.3d at 1209. The *Sleekcraft* factors are "not a rote checklist"—rather, "[a] determination may rest on only those factors that are most pertinent to the particular case before the court, and other variables besides the enumerated factors should also be taken into account based on the particular circumstances." *Id.* "[T]he *sine qua non* of trademark infringement is consumer confusion, and . . . the *Sleekcraft* factors are but a nonexhaustive list of factors relevant to determining the likelihood of consumer confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1142 (9th Cir. 2011). [4]

---

[4] The Ninth Circuit has stated that the *Sleekcraft* factors should be considered "(roughly) in order of their importance in [each] particular case" and warned "against simply launching into a mechanical application of the eight-factor *Sleekcraft* test." *Brookfield*, 174 F.3d at 1055 n.16. Accordingly, even though the analysis below begins by addressing each factor in the order set out in *Sleekcraft*, the analysis concludes with an

A.    **Strength Of The Mark**

Under the first ("strength of the mark") *Sleekcraft* factor, "[m]arks are often classified in categories of generally increasing distinctiveness" as follows: "(1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).  "A strong mark is inherently distinctive, for example, an arbitrary or fanciful mark; it will be afforded the widest ambit of protection from infringing uses.  A descriptive mark tells something about the product; it will be protected only when secondary meaning is shown.  In between lie suggestive marks which subtly connote something about the products.  Although less distinctive than an arbitrary or fanciful mark and therefore a comparatively weak mark, a suggestive mark will be protected without proof of secondary meaning." *Sleekcraft*, 599 F.2d at 349.  "[T]he strength of a mark depends, at least in part, on where it falls on a spectrum ranging from the 'arbitrary' to the 'generic.'" *Rearden*, 683 F.3d at 1211.

Unfortunately, Plaintiff's motion for default judgment does not acknowledge this spectrum or attempt to identify which category is applicable here.  Instead, Plaintiff simply asserts that "[b]y virtue of ASU's longstanding and widespread use and substantial promotion of the ASU Marks, and their widespread exposure and impact on the community, the ASU Marks are famous and strongly associated with ASU and should be accorded greater protection." (Doc. 17 at 11.)  This single sentence of argument, focused only on the volume of advertising activity and exposure, is not particularly helpful in evaluating the strength of the mark. *Nutri/Sys., Inc. v. Con-Stan Indus., Inc.*, 809 F.2d 601, 605 (9th Cir. 1987) ("Nutri/System contends . . . that its extensive advertising somehow transformed its mark into a strong or arbitrary one.  While consumer recognition of a mark may increase the amount of protection afforded it, it does not mean the mark becomes arbitrary. . . .  Advertising remains only one of many factors taken into account when classifying the strength of marks.  Therefore, the district court did not clearly err in finding 'Nutri/System' to be a 'weak' mark.") (citations omitted).

assessment of the relative strength of each factor.

Turning back to the spectrum of distinctiveness, there is a split of authority as to whether a mark formed by initials should be considered descriptive or suggestive. *Abundant Living Fam. Church v. Live Design, Inc*, 2022 WL 14708949, *5 n.2 (C.D. Cal. 2022) ("Both inside and outside the Ninth Circuit, courts split in analyzing the distinctiveness of marks made with initials."); *ACI L. Grp. PLLC v. ACI L. Grp. PC*, 2021 WL 4263692, *17 (D. Ariz. 2021) ("Courts are split as to whether initials are considered 'descriptive' or 'suggestive' marks."). This case thus raises complicated questions about how to characterize the strength of a mark composed of the initials ASU—initials that, it should be noted, are not unique to Arizona State University and are shared with many other colleges and universities in America, including Alabama State University, Arkansas State University, Albany State University, Alcorn State University, Augusta State University, Angelo State University, Appalachian State University, and Athens State University, not to mention with the insurance company American Sports Underwriters. *See generally* Joseph C. Gioconda, *School Nicknames & Acronyms as Trademarks: Kicking the Band Off the Bandwagon*, 8 Ariz. St. Sports & Ent. L.J. 1, 17-19 (2018) ("[A]cronyms and initials used as linguistic shorthand to describe universities and colleges are often as old as the schools themselves. ASU, for example, has been used to refer to a number of schools, including Alabama State University, Arizona State University, Angelo State University, and others. As a result, in the United States Patent and Trademark Office, there have been many competing interests vying over legal ownership of these initials."). Indeed, Angelo State University owns a live trademark ("the Angelo Mark"), registration number 4395756, registered in 2013, featuring the initials ASU with a ram horn between the letters "S" and "U":

The Angelo Mark is for goods and services including, *inter alia*, clothing including "sweat

bands, sweatshirts, sweatpants, bandanas, running and athletic shorts" and "entertainment services" including "college sport games and sporting events rendered live and through the media of radio, television and online."[5]  Plaintiff challenged the Angelo Mark in a Trademark Trial and Appeal Board ("TTAB") proceeding, initiated in 2017.  The petition for cancellation asserted a likelihood of confusion with Plaintiff's marks,[6] and Angelo State University responded that "there is no likelihood of any confusion between the parties' respective marks, given factors such as the different geographic locations of the parties, the divergent trade channels, logos, marketing, association with the respective universities, etc., for the parties' respective goods and services" and that "the parties have coexisted for many years, each using its respective 'ASU' mark, and no instance of actual or likelihood of confusion has been raised to date."[7]  In June 2019, Plaintiff withdrew the petition for cancellation,[8] and the TTAB denied the petition to cancel with prejudice.[9]

Nevertheless, even assuming that a mark composed of the initials ASU should only be deemed descriptive rather than suggestive—a determination that means "it must have a secondary meaning (acquired distinctiveness) to receive protection"—courts have held that "secondary meaning need only be plead[ed] generally to survive a motion to dismiss." *Abundant Living Family Church*, 2022 WL 14708949 at *5 (citing cases).  Courts have also held that when a complaint pleads that the plaintiff is "very large," that the plaintiff has "regularly used the mark in commerce," and that the mark has "become famous and distinctive" as a result, such allegations "are sufficient to plausibly plead secondary meaning."  *Id.* at *6.  Such is the case here—the complaint is replete with allegations regarding Plaintiff's extensive promotion of its ASU marks and the extensive volume of media coverage referring to Arizona State University as ASU.  (Doc. 1 ¶¶ 13-16.)  The complaint thus plausibly alleges that the marks are strong enough to warrant trademark

---

[5]    https://tmsearch.uspto.gov/search/search-results/85830578
[6]    https://ttabvue.uspto.gov/ttabvue/v?qt=adv&procstatus=All&propno=85830578
[7]    https://ttabvue.uspto.gov/ttabvue/v?pno=92067468&pty=CAN&eno=4
[8]    https://ttabvue.uspto.gov/ttabvue/v?pno=92067468&pty=CAN&eno=13
[9]    https://ttabvue.uspto.gov/ttabvue/v?pno=92067468&pty=CAN&eno=14

protection, albeit still relatively weak in comparison to arbitrary or fanciful marks. *Brookfield*, 174 F.3d at 1058 ("[U]nlike arbitrary or fanciful marks which are typically strong, suggestive marks are presumptively weak.").

The same conclusion would follow if the analysis were limited to the '709 mark, which does not consist only of initials but rather is an illustrated drawing consisting of stylized initials with an image of a rising or setting sun. The incorporation of the sun makes the mark suggestive. "A 'suggestive' term suggests rather than describes an ingredient, quality, or characteristic of the goods and requires imagination, thought, and perception to determine the nature of the goods." *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1014-15 (9th Cir. 1979). A quality of Arizona State University is the warm, sunny climate where it is located, and the sun illustration requires a modicum of perception to make this connection. But even so, as noted, "suggestive marks are presumptively weak." *Brookfield*, 174 F.3d at 1058.

### B. Proximity Of The Goods

When considering "the competitive proximity" of products, courts consider whether "the products are used for similar purposes" and whether the plaintiff and defendant "compete for the patronage of an overlapping audience." *Id.* at 1056. "The proximity of goods is measured by whether the products are: (1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." *Network Automation*, 638 F.3d at 1150.

As noted, the goods produced by Defendant are strength training equipment, predominantly ropes and bands for fitness training. Plaintiff, in turn, alleges that it "rents different kinds of sports and fitness equipment" and "sells athletic equipment" (Doc. 1 ¶¶ 11-12), albeit without alleging the specific kinds of athletic and fitness equipment it rents and sells.

"Athletic equipment" and "fitness equipment" are extremely broad categories of products, and it is not clear that every (or even most) products falling within those categories are similar in use and function to ropes and bands used for strength training

and/or are sold to the same class of purchasers as ropes and bands used for strength training. Indeed, the complaint alleges that the specific types of "athletic equipment" covered by the '709 mark are "backboards for basketball, baseballs, basketballs, board games, dolls, golf ball markers, golf balls, rubber action balls, sports balls, stuffed toy animals, tennis balls." (Doc. 1 ¶ 8.) The Court is skeptical that a stuffed toy animal bearing the '709 mark or even a baseball bearing the '709 mark could be deemed similar in use and function to strength training products bearing Defendant's marks, such as the following "Poly Dacron Weighted Battle Rope By ASU Trainer" identified in the complaint:

ASU TRAINER
Poly Dacron Weighted Battle Ropes By ASU Trainer
$99.99 USD $59.99 USD  Sale
Shipping calculated at checkout.
Pay in 4 interest-free installments of $14.99 with shop Pay
Learn more
★★★★★ 1,035 Reviews

Nevertheless, at least for purposes of the third *Eitel* factor, it is unnecessary to go down this road. The complaint alleges that Plaintiff sells and rents "athletic" and "fitness" equipment. Although it would have been helpful for the complaint to go further and identify the specific types of athletic and fitness equipment being sold and rented, that level of detail isn't required under Rule 8. *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1048-49 (9th Cir. 2012) ("[T]o satisfy Rule 8(a)(2), a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Although this standard requires that a claim be plausible on its face, it does not require that a complaint contain detailed factual allegations. As the text of Rule 8(a)(2) itself makes clear, even a short and plain statement can state a claim for relief.") (cleaned up).

Additionally, for purposes of evaluating the sufficiency of the complaint, all reasonable inferences must be drawn in favor of Plaintiff's well-pleaded factual allegations. *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1137 (9th Cir. 2019) ("All factual allegations are accepted as true, and all reasonable inferences must be drawn in favor of the plaintiff. The standard provides for liberal treatment of a plaintiff's complaint at the pleading stage."). It is reasonable to infer that athletic and fitness equipment have competitive proximity with the ropes and bands being sold by Defendant and would be purchased by the same class of consumers. *Starr v. Baca*, 652 F.3d 1202, 1216-17 (9th Cir. 2011) ("[T]he factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation. . . . Rule 8(a) does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence to support the allegations.") (cleaned up). Thus, the complaint contains sufficient factual allegations to support the conclusion that the second *Sleekcraft* factor tips, if not overwhelmingly, in Plaintiff's favor.

### C.    **Similarity Of The Marks**

As for the third ("similarity of the marks") *Sleekcraft* factor, "[s]imilarity of the marks is tested on three levels: sight, sound, and meaning. Each must be considered as they are encountered in the marketplace. Although similarity is measured by the marks as entities, similarities weigh more heavily than differences." *Sleekcraft*, 599 F.2d at 351. "[T]he trademark is not judged by an examination of its parts, but rather the validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace." *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1082 (9th Cir. 2005) (cleaned up).

The obvious similarity between Plaintiff's marks and the two marks Defendant attempted to register is the shared presence of the initials "ASU." But the marks are visually dissimilar in other ways. Defendant's marks do not include the illustration of the sun that makes the '709 mark suggestive, and they include an angular logo that bears no

similarity to any aspect of the '709 mark (or any of Plaintiff's other marks). As for fonts, the '709 mark includes serifs at the top left portion of the "A" and the bottom right portion of the "U" (making the "U" appear to be lowercase but still the same size as the other letters), whereas the fonts in Defendant's marks are fully sans serif. As for letter spacing, the letters in Defendant's marks are spaced in a conventional fashion, whereas the letters in the '709 mark are connected, with no space between them aside from the bright sun surrounding the "S," such that all portions of the three letters form an unbroken line. Unlike Plaintiff's marks, Defendant's marks include the word "Trainer," which is italicized with the first letter capitalized in the '418 mark, and, in the case of the '490 mark, the word "TRAINER" is fully capitalized, bolded, and appended to "ASU" in an identical font without additional space, creating the impression that "ASUTRAINER" is all one word.

The inclusion in Defendant's marks of the word "trainer" also results in marks that sound different than Plaintiff's marks when spoken aloud. It is unclear whether a reader of "ASUTRAINER" would speak the word aloud as "A-S-U-TRAINER" or "AH-SOO-TRAINER"—that is, whether the reader would perceive the "ASU" portion of the word as initials or syllables. But either way, the addition of the "trainer" portion of the word adds to the sound of the spoken-aloud mark.

This backdrop creates something of a mixed bag when it comes to similarity. On the one hand, the Ninth Circuit has found that the requisite degree of similarity may exist when the challenged mark incorporates, in its entirety, the letters comprising the plaintiff's mark. *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1174 (9th Cir. 2007) ("The record in this case reflects the requisite similarity between the two marks. 'Perfumebay' incorporates the eBay trademark in its entirety, especially when Perfumebay utilizes the spelling as 'PerfumeBay.'"); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291-92 (9th Cir. 1992) (affirming the district court's conclusion that "the shared dominant element of GALLO" in both marks was "sufficient evidence to support a finding of similarity," even though the district court "conceded that the marks were not similar in appearance," and rejecting the defendant's argument "that the existence of the dominant

element of GALLO in both the Winery's marks and in his mark cannot by itself constitute similarity"). *See also Entrepreneur Media, Inc. v. Nkwocha*, 2019 WL 13038205, *1-2 (C.D. Cal. 2019) (granting default judgment in trademark infringement action to a plaintiff that owned "various trademarks that include the ENTREPRENEUR® term" and explaining that the defendant's "use of the MY ENTREPRENEUR MAGAZINE mark" was likely to cause consumer confusion in part because the "two marks are similar in sharing the dominant term 'Entrepreneur'"). On the other hand, such incorporation does not automatically support a finding of similarity. *Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980) ("Appellant's . . . trademark is ALPHA. Appellee's tradename is ALPHA STEEL TUBE & SHAPES, INC., and its trademark ALPHA STEEL TUBE or ALPHA STEEL. . . . [C]onsidering the marks and names in their entirety and as they appear in the marketplace, the district court's finding [of no similarity] is not clearly erroneous. Appellant often uses the word ALPHA alone and in a distinctive logo; Appellee uses ALPHA always in conjunction with another word or words (steel, tube, shapes). These other words are significant words, indicating a different origin, not merely descriptive words.") (cleaned up); *Self-Ins. Inst. of Am., Inc. v. Software & Info. Indus. Ass'n*, 208 F. Supp. 2d 1058, 1071-72 (C.D. Cal. 2000) ("Despite the fact that both Marks contain 'SIIA,' they each contain additional elements that are visually distinct. A large eagle, whose wing surrounds part of the letters 'SIIA' is a predominant element of Self–Insurance's Mark. Software's Mark contains both a small circular design above 'SIIA' and the text of its name spelled out. . . . The Court finds that despite a common element, the Marks, as used in the marketplace, are not similar.").

Given these principles, the question of similarity poses a complicated question. But at least in relation to the third *Eitel* factor, the Court's role is not to act as ultimate factfinder. Instead, the question is simply whether "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. Furthermore, "all reasonable inferences must be drawn in favor

of the plaintiff." *Austin*, 925 F.3d at 1137.  In light of those principles, Plaintiff has done enough at the pleading stage to establish that the third *Sleekcraft* factor tips in its favor.

### D.    Evidence Of Actual Confusion

As for the fourth ("evidence of actual confusion") *Sleekcraft* factor, Plaintiff has not alleged any facts suggesting there has been actual confusion and Plaintiff's default judgment motion does not make any arguments regarding this factor.  Accordingly, this factor does not affirmatively support Plaintiff's position.

With that said, "in this circuit, actual confusion is not necessary to a finding of likelihood of confusion under the Lanham Act." *Acad. of Motion Picture Arts & Scis. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991).  "Because of the difficulty in garnering such evidence, the failure to prove instances of actual confusion is not dispositive.  Consequently, this factor is weighed heavily only when there is evidence of past confusion or, perhaps, when the particular circumstances indicate such evidence should have been available." *Sleekcraft*, 599 F.2d at 353.  This appears to be particularly true before discovery.  *Good Clean Love, Inc. v. Audacious Beauty, LLC*, 2024 WL 4529028 *6 (D. Or. 2024)*6 ("At this stage of litigation, this Court does not have a repository of facts nor the benefit of extensively briefed motions for summary judgment, supported by a plethora of expert reports regarding the likelihood (or not) of confusion.") (cleaned up); *136 Collins Ave., LLC v. O.P.M.L.V., LLC*, 2006 WL 8441378, *3 (D. Nev. 2006) ("failure to demonstrate actual confusion amongst the parties' respective customers" not "fatal to" a complaint).

### E.    Marketing Channels Used

Plaintiff's sole argument as to the fifth ("marketing channels used") *Sleekcraft* factor is that "[b]oth Defendant's goods and ASU authorized and licensed merchandise are being sold on Amazon."  (Doc. 17 at 13.)[10]

This factor fails to support a likelihood of confusion for two reasons.  First, "[t]oday,

---

[10]    The complaint does not contain any allegations regarding licensing activity or sales via Amazon, but Plaintiff has provided evidence in support of its default judgment motion suggesting that "ASU merchandise" is sold on Amazon.  (Doc. 18 ¶ 14.)

it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion." *Network Automation*, 638 F.3d at 1151. Although there may still be certain marketing channels that are relevant in the likelihood-of-confusion context, "this factor becomes less important when the marketing channel is less obscure." *Id*. Amazon is anything but obscure—it is "one of the world's largest online retailers." *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 14 (1st Cir. 2020).

Second, as discussed in earlier portions of this order, the complaint imprecisely alleges that Plaintiff "sells athletic equipment" and "rents different kinds of sports and fitness equipment." (Doc. 1 ¶¶ 10-12.) Of those items, "fitness" equipment seems most equivalent to the strength training ropes and bands sold by Defendant, but there is no allegation that Plaintiff *sells* fitness equipment—instead, Plaintiff apparently only *rents* fitness equipment. Presumably, such rentals occur in and around Arizona State University's campuses, and there is no allegation that Defendant engages in similar rental activities anywhere, let alone in and around those campuses.

For these reasons, the fifth *Sleekcraft* factor weighs against a likelihood of confusion.

F.    **Degree Of Consumer Care**

Plaintiff fails to make any argument regarding the sixth ("degree of consumer care") *Sleekcraft* factor, so this factor is construed against a likelihood of confusion. *Vital Pharms., Inc. v. PhD Mktg., Inc.*, 2020 WL 6545995, *7 (C.D. Cal. 2020) ("Plaintiff fails to address this factor. It therefore weighs against confusion."); *Dahl v. Swift Distribution, Inc.*, 2010 WL 1458957, *10 (C.D. Cal. 2010) ("Plaintiff fails to address this factor . . . . Thus, this factor weighs in favor of Defendants and against a finding of a likelihood of confusion."). Furthermore, this factor typically requires courts to consider whether the goods are "expensive" and also to "look at the specific products in question rather than just the price." *Dahl*, 2010 WL 1458957 at *9. Here, where Plaintiff imprecisely alleges that it rents "fitness" equipment, there is no way to know whether that equipment is expensive

(like stationary bikes) or inexpensive (like ping pong balls) or what the rental rates are, nor is there any way to "look at the specific products in question." *Id.* As for Defendant's goods, they are relatively expensive—the rope depicted above is listed for sale at $59.99, marked down from $99.99, suggesting that consumers might exercise some care when shopping. This weighs against a likelihood of confusion.

### G. Defendant's Intent In Selecting The Mark

As for the seventh ("defendant's intent in selecting the mark") *Sleekcraft* factor, "[w]hen the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Skeekcraft*, 599 F.2d at 354. As discussed above, the parties' marks are similar in some ways and dissimilar in others, such that the similarity inquiry is a mixed bag.

Moreover, the allegations do not establish (or even raise a plausible inference) that when Defendant adopted its challenged marks, it did so with the intent of adopting a mark similar to Plaintiff's mark. Plaintiff's sole argument regarding intent is that Defendant "continued" to sell its products after the USPTO "not once, but twice" rejected Defendant's registration applications on the ground that Defendant's marks were "likely to cause confusion with" the '709 mark. (Doc. 17 at 13.) But "continuing" to use a mark that is already in use is not the same as "adopting" a new mark.[11] Persistence in using an already-existing mark after receiving notice of potential confusion does not give rise to a presumption that infringement is intentional. *Straus v. Notaseme Hosiery Co.*, 240 U.S.

---

[11] Moreover, the Ninth Circuit has held that a likelihood-of-confusion finding by the USPTO may "be regarded as inconclusive." *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970). *See also Progressive Distribution Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 426 (6th Cir. 2017) ("[T]he Ninth Circuit has held that a preliminary determination by a low-level USPTO administrator should not be accorded much weight, especially where the USPTO officer did not have access to the same type of information that informs a likelihood of confusion analysis."); *Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 850 (7th Cir. 2023) ("USPTO determinations are often of limited value in the infringement analysis when they lack the benefit of the fuller record developed before the district court, such as evidence about the way marks are actually used in the marketplace. This is not to say that USPTO preliminary determinations are never useful, but the district court's decision to accord it little weight in this case [in its capacity as factfinder for purposes of a preliminary injunction request] was not clearly erroneous.").

179, 181-82 (1916) ("[T]he defendants' persistence in their use of the design after notice proves little or nothing against them.  They had been advertising their goods by name and using the design in connection with the name.  The natural interpretation is not that they wanted to steal the plaintiff's good will, of which they then learned for the first time, but that they wished to preserve their own.  When they stood upon their rights of course they made themselves responsible for the continued use of a label that might be held likely to deceive, and if it should be held manifestly to have that tendency, they would be chargeable for what, in contemplation of law, was an intentional wrong, or a fraud, although the case is wholly devoid of any indication of an actual intent to deceive, or to steal the reputation of the plaintiff's goods.  If the defendants' conduct was a wrong, as we have assumed, it was a wrong knowingly committed, but no further inference against the defendants can be drawn from the fact.").

Moreover, the Court takes judicial notice of the official website of the Florida Department of State, which identifies the registered agent of Team ASU, LLC (along with several other LLCs) as Shai Asulin.[12]  This raises a potential inference that Defendant's marks were simply intended to incorporate the first three letters of Defendant's agent's last name, not the initials of Arizona State University.

For these reasons, the seventh factor weighs against a likelihood of confusion, even when all reasonable inferences from the well-pleaded facts are drawn in Plaintiff's favor.

### H.    Likelihood Of Expanding Product Lines

Plaintiff fails to make any argument regarding the eighth ("likelihood of expanding product lines") *Sleekcraft* factor, so this factor is construed against a likelihood of confusion.  *Vital Pharms.*, 2020 WL 6545995 at *7; *Dahl*, 2010 WL 1458957 at *10.

---

[12]    The Florida Department of State's main website, https://dos.fl.gov/, contains a variety of links under the heading of "Corporations," which direct the user to the "sunbiz.org" domain.  The "Search Our Records" link allows a user to search by name of an LLC.    The    search    result    for    "Team    ASU, LLC"    is    available    at https://search.sunbiz.org/Inquiry/CorporationSearch/SearchResultDetail?inquirytype=EntityName&directionType=Initial&searchNameOrder=TEAMASU%20L190001333020&aggregateId=flal-119000133302-8bce00c3-2eb6-4736-ac81-dab4df1c59e2&searchTerm=team%20asu&listNameOrder=TEAMASU%20L190001333020. [https://perma.cc/KU2C-B6BV].

Furthermore, there are no allegations in the complaint that Plaintiff has any intention to expand into selling strength training ropes and bands or that Defendant has any intention of expanding into the specific products covered by class 28 (*i.e.*, "backboards for basketball, baseballs, basketballs, board games, dolls, golf ball markers, golf balls, rubber action balls, sports balls, stuffed toy animals, tennis balls") or class 18 (*e.g.*, "all purpose athletic bags") or class 25 (*e.g.*, t-shirts and shorts).

## I.    Summary As To The *Sleekcraft* Factors

The well-pleaded facts in the complaint do not paint an overwhelming picture of likely consumer confusion.  Plaintiff's marks are not terribly strong (even though, as alleged, they are strong enough to trigger trademark protection); there is no allegation of actual consumer confusion; the only overlap in marketing channels is that Defendant's products and the products of Plaintiff's licensees are both sold via Amazon; the allegations do not support an intent to infringe; and Plaintiff points to no allegations establishing a low degree of consumer care or a likelihood of expanding product lines.  Furthermore, although the complaint does enough to plead similarity and proximity of goods, those showings are not slam dunks.  Indeed, the visual similarity between the marks is limited to the common use of the letters "ASU" (which initials are also shared by many other schools and institutions and also appear in the Angelo Mark) while other dissimilar features abound, Defendant's intent in using the letters "ASU" may very well be explained by Defendant's agent's last name, and the proximity inquiry is complicated by Plaintiff's imprecision in pleading the specific types of "athletic" and "fitness" goods it sells and rents.

Even so, dismissal is appropriate only when the plaintiff "has not alleged facts that would permit a conclusion that consumers are likely to be confused." *Toho Co. v. Sears, Roebuck & Co.*, 645 F.2d 788, 791 (9th Cir. 1981).  "Because a careful assessment of the pertinent factors that go into determining likelihood of confusion usually requires a full record, dismissal of trademark disputes at the pleading stage is generally disfavored." *Trader Joe's Co. v. Trader Joe's United*, 150 F.4th 1040, 1049 (9th Cir. 2025) (cleaned up).  "[T]rademark infringement cases in which there is no plausible likelihood that a

- 22 -

reasonably prudent consumer would be confused about the origin of the goods" are "rare." *Id.* at 1054. Such rare cases do, of course, exist. *Ariz. Bd. of Regents for & on behalf of Arizona State Univ. v. Doe*, 2022 WL 1514649, *2 (9th Cir. 2022) ("The district court conducted its likelihood of confusion analysis by looking at the full context of Doe's Instagram posts and by expressly evaluating some of the *Sleekcraft* factors. The court's analysis included a review of the surrounding posts, comments, and the context in which the posts were made. Only after conducting this review, and analyzing some of the *Sleekcraft* factors, did the district court find that there was no likelihood of confusion. We find that the district court properly applied the factors and did not abuse its discretion."). But this is not such a case. Because Plaintiff has done enough, when all reasonable inferences are resolved in its favor at the pleading stage, to allege a likelihood of consumer confusion, the third *Eitel* factor supports the entry of default judgment.

II.    The Second *Eitel* Factor—Merits

Even though courts often analyze the second and third *Eitel* factors together, they are not synonymous.[13] Thus, even when a complaint is sufficient to meet the pleading requirements established by Rule 8 and *Iqbal/Twombly* (such that the third *Eitel* factor is satisfied), a district court that harbors "serious reservations about the merits of [the plaintiff's] substantive claim, based upon the pleadings" (the second *Eitel* factor) retains discretion to deny the entry of default judgment. *See, e.g.*, *DDCIP Techs., Inc. v. 4INFO TV, LLC*, 2007 WL 9777931, *1-2 (S.D. Cal. 2007) ("[A]ny doubts as to the propriety of a default are usually resolved against the party seeking a default judgment. In this case, the Court has some doubts about the propriety of entering default judgment against Defendants . . . although Plaintiff has adequately stated its claims against Defendants . . . . Considering all of these factors, and the policy favoring merit-based resolution of disputes, the Court finds Plaintiff is not entitled to the requested default judgment.") (cleaned up). This makes sense, as "judgment by default is a drastic step appropriate only in extreme

---

[13]    Indeed, if the two factors were synonymous, there would have been no reason for the Ninth Circuit to separately identify them.

circumstances; a case should, whenever possible, be decided on the merits." *United States v. Signed Pers. Check No. 730 of Yubran S. Mesle*, 615 F.3d 1085, 1091 (9th Cir. 2010). *See also Latshaw v. Trainer Wortham & Co.*, 452 F.3d 1097, 1103 (9th Cir. 2006) ("Default judgments are disfavored and appropriate only in unique circumstances."); *Aldabe*, 616 F.2d at 1092-93 ("The district court's decision whether to enter a default judgment is a discretionary one.  Given the lack of merit in appellant's substantive claims, we cannot say that the district court abused its discretion in declining to enter a default judgment in favor of appellant.").

For the reasons discussed in detail in Part I above, the Court harbors serious concerns about the merits of Plaintiff's claims.  Although those claims may be sufficiently pleaded to survive a motion to dismiss, the Court seriously questions—at least on this record—whether a consumer would mistakenly perceive Defendant's strength training bands and ropes as "emanat[ing] or originat[ing] from Arizona State University" and/or as being "authorized, sponsored, or approved by Arizona State University."  (Doc. 1 ¶ 42.) The Court does not foreclose the possibility that Plaintiff could bolster its likelihood-of-confusion showing through the presentation of additional evidence and more developed arguments, but the current default judgment motion—which, in large part, simply reiterates the allegations in the complaint—fails to assuage these serious concerns about the merits of Plaintiff's claims.

Furthermore, the only relief sought in the default judgment motion is injunctive relief.  The Lanham Act provides that courts have the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent" violations under the Act and establishes "a rebuttable presumption of irreparable harm" upon a finding of success on the merits (for a permanent injunction) or "upon a finding of likelihood of success on the merits" (for a preliminary injunction). 15 U.S.C. § 1116(a).  "By its terms, the presumption only applies 'upon a finding of likelihood of success.'" *Zamfir v. Casperlabs, LLC*, 528 F. Supp. 3d 1136, 1150 (S.D. Cal. 2021).  But because the Court harbors serious concerns about the merits of Plaintiff's

claims, the presumption does not apply.

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Where the presumption does not apply, a court granting injunctive relief must make "factual findings that would support a likelihood of irreparable harm." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013); *see also Zamfir*, 528 F. Supp. 3d at 1150 ("*Herb Reed* still applies to a case in which the plaintiff fails to show a likelihood of success on the merits."). "A plaintiff must present case-specific evidence of irreparable harm, rather than relying on generic factors that are present whenever a trademark is infringed." *Zamfir*, 528 F. Supp. 3d at 1150.

Plaintiff argues that "Defendant's unauthorized use of the ASU Marks deprives ASU of the control over its goodwill and reputation." (Doc. 17 at 14.) This is not "case-specific evidence of irreparable harm" but is rather the sort of "generic" assertion that is "present whenever a trademark is infringed." *Zamfir*, 528 F. Supp. 3d at 1150. Considering the serious concerns about whether confusion is likely in this case, there is nothing to compel the conclusion that Plaintiff has suffered or is likely to suffer irreparable harm.[14]

---

[14] Defendant appears to have largely, but not entirely, voluntarily discontinued using both the '418 mark and the '490 mark. The declaration of Sean Garrison, dated July 11, 2025, indicates that "Defendant is now redirecting the asutrainer.com domain name to a different URL—monfitness.com. However, Defendant continues to use ASU TRAINER on that website and its associated YouTube page." (Doc. 18 ¶ 12.) Exhibit F to the declaration includes a screenshot of the "About Us" page of the monfitness.com website, showing that the company still referred to itself as "ASU Trainer." (Doc. 18-6 at 2.) However, at the time of this order's issuance, and for several months beforehand, the asutrainer.com domain name has been a dead link. Moreover, the "About Us" page of the monfitness.com website [https://perma.cc/6BLT-ZW5S] now refers to the company as "MONFIT," not "ASU Trainer," and all of the merchandise available for sale on the main website bears the name "MONFIT" in stylized lettering and bears no trace of the '418 mark or the '490 mark [https://perma.cc/UJC2-9UEU]. It appears that the only mention of "ASU Trainer" on the website appears on some linked social media posts viewable on the

*Cf. Luxury Auto Collection LLC v. Walker*, 2022 WL 17361292, *8 (D. Ariz. 2022) ("[T]he Court recommends against entering default judgment for Luxury Auto, in part because it cannot show the merits of its claim and sufficiency of its amended complaint weigh in favor of default judgment. Accordingly, Luxury Auto has not established actual success on the merits, a requisite for the Court to grant a permanent injunction."). The fact that the only relief Plaintiff seeks in its default judgment motion cannot be granted under the applicable legal standard further weighs against granting default judgment under the second *Eitel* factor.

III.    The First, Fifth, Sixth, And Seventh *Eitel* Factors

"In cases like this one, in which Defendant[] ha[s] not participated in the litigation at all, the first, fifth, sixth, and seventh [*Eitel*] factors are easily addressed." *Zekelman Indus. Inc. v. Marker*, 2020 WL 1495210, *3 (D. Ariz. 2020).

The first factor, the possibility of prejudice to the plaintiff, weighs in favor of default judgment. Denial of Plaintiff's motion would leave Plaintiff without other recourse for recovery. *PepsiCo, Inc. v. Cal. Sec. Cans.*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).

The fifth and sixth factors, the possibility of factual disputes and whether the default was due to excusable neglect, weigh in favor of default judgment or are neutral. Indeed, Defendant has been aware of the complaint for over a year and initially participated in settlement discussions via counsel retained for settlement purposes only. (Doc. 18-2.)

The seventh factor, the policy favoring decisions on the merits, generally weighs against default judgment, given that cases "should be decided on their merits whenever

---

"Giveaways" page [https://perma.cc/JP9H-RCUK]. Those social media posts, however, contain timestamps indicating they were posted "about 3 years ago," and the Giveaways page includes instructions specifying that the "[e]ntry deadline for the February Giveaway is February 28, 2023"—details suggesting these are obsolete entries. Exhibit F also includes a screenshot of a YouTube channel for "ASU Trainer" @asutrainer with a "Shorts" video that contains a scarlet banner with the words "Resistance Bands By Asu Trainer." (Doc. 18-6 at 3.) However, at the time of this order's issuance, @asutrainer no longer appears to be a YouTube channel. Defendant's YouTube channel appears to be @monfit-shop, which includes a "Description" that repeatedly identifies the brand as "MONFIT" with no mention of ASUTrainer. However, the short video is still available for viewing. The video features Defendant's goods as they used to be (branded with the '418 mark), not as they are now (branded with the word MONFIT in stylized lettering).

- 26 -

reasonably possible." *Eitel*, 782 F.2d at 1472. However, the existence of Rule 55(b), which authorizes default judgments, "indicates that this preference, standing alone, is not dispositive." *PepsiCo*, 238 F. Supp. 2d at 1177.

IV.    The Fourth *Eitel* Factor—The Amount Of Money At Stake

Although the complaint includes a request for monetary damages, the motion for default judgment clarifies that Plaintiff "is not seeking money damages against Defendant but intends to file a motion for attorney's fees and costs pursuant to 15 U.S.C. §1117, FRCP 54(d)(2), and LRCiv 54.2 upon entry of a final judgment." (Doc. 17 at 1-2.) The amount of fees at stake is likely substantial, but less substantial than a damages award would be. Furthermore, there can be serious interests at stake, aside from money, in a default judgment motion seeking injunctive relief that would include orders to forfeit a domain name and destroy existing products. (Doc. 17-1 at 4.) Thus, this factor is neutral.

V.    Conclusion As To The *Eitel* Factors

The *Eitel* factors do not point uniformly in either direction in this case. On the one hand, because Defendant chose not to participate in this litigation (despite being aware of it and even participating in settlement negotiations), the first, fifth, and sixth *Eitel* factors support Plaintiff's request or are at worst neutral. Additionally, because the complaint does enough to satisfy the relevant pleading standards, the third *Eitel* factor supports Plaintiff's request. On the other hand, the second and seventh *Eitel* factors cut against Plaintiff's request given that the Court harbors serious doubts about the merits, that Plaintiff has not established an entitlement to the sole remedy it seeks, and that default judgment is a disfavored remedy.

Ultimately, the Court concludes that its serious doubts as to the merits counsel against granting default judgment. *Aldabe*, 616 F.2d at 1092-93 (lack of merit in substantive claims sufficient justification for declining to enter a default judgment); *NewGen*, 840 F.3d at 616 (default judgments disfavored); *Pearson*, 2016 WL 5496268 at *3 ("[A]ny doubts as to the propriety of a default are usually resolved against the party seeking a default judgment."); *DDCIP Techs., Inc.,* 2007 WL 9777931 at *1-2 (denying

motion for default judgment even though "Plaintiff has adequately stated its claims against Defendants" in light of "the policy favoring merit-based resolution of disputes"). This ruling is without prejudice to Plaintiff's submission of a renewed motion for default judgment that contains more developed arguments and/or additional supporting evidence.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for default judgment (Doc. 17) is **denied**.

**IT IS FURTHER ORDERED** that within 14 days of the issuance of this order, Plaintiff shall file a status update indicating how it plans to proceed.

Dated this 19th day of March, 2026.

_____
Dominic W. Lanza
United States District Judge